Roosevelt C. BENTLEY, Petitioner–Appellee,

v.

Charles SCULLY, Superintendent, Greenhaven Correctional Facility, Respondent–Appellant.

No. 2429, Docket 94–2290.

United States Court of Appeals, Second Circuit.

Argued Aug. 9, 1994.

Decided Dec. 1, 1994.

---

Robert T. Johnson, Dist. Atty., Bronx County, for appellant.

Randall D. Unger, Kew Gardens, NY, for appellee.

Before: WINTER, LEVAL, Circuit Judges, and SKRETNY, District Judge.*

SKRETNY, District Judge:

Respondent Charles Scully, Superintendent of New York's Greenhaven Correctional Facility (the "State") appeals from a judgment entered in the United States District Court for the Southern District of New York, Sweet, J., granting petitioner Roosevelt Bentley's ("petitioner" or "Bentley") petition for a writ of habeas corpus, 851 F.Supp. 586. Appellant seeks reversal of the district court's decision on several grounds. Specifically, appellant argues that the petition should be denied (1) under the abuse of writ doctrine, (2) because the district court erred in finding that petitioner's claim of prosecutorial misconduct was not procedurally barred, and (3) because the district court improperly determined that the prosecutor's statement during summation deprived petitioner of a fair trial. Finding that the trial error asserted by petitioner was harmless under the standard of *Brecht v. Abrahamson*, —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), *reh'g denied*, —— U.S. ——, 113 S.Ct. 2951, 124 L.Ed.2d 698 (1993), we vacate the judgment of the district court and remand with directions to dismiss the writ for the reasons set forth below.

## BACKGROUND

### A. Facts

The facts of this case are detailed in the opinion of the New York State Supreme Court, Appellate Division, First Department, ("Appellate Division") which considered petitioner Bentley's direct appeal of his trial court conviction. *People v. Bentley*, 112 A.D.2d 109, 492 N.Y.S.2d 381 (1st Dept.1985), *appeal denied*, 66 N.Y.2d 761, 497 N.Y.S.2d 1034, 488 N.E.2d 120 (1985). We reiterate only the facts necessary to address the issues before this Court.

On November 15, 1979, cab driver Joseph Bunyarko ("Bunyarko") was dispatched by radio to pick up passengers at 1020 Grand Concourse, a Bronx apartment building. Upon his arrival shortly after midnight, a man and woman walked from the building towards the passenger door of the cab. Bunyarko recognized the woman, a regular customer named Wanda, but did not recognize the man with her. As they approached the cab, Bunyarko said "Hello." In response, the man asked, "Is your name Joe, are you car 84?" Bunyarko leaned across the cab, rolled down the passenger door window, and responded affirmatively. When Bunyarko motioned as if he were going to roll up the window, the man commanded, "Don't touch the window or I'll blow your head off." A moment later the man pointed a gun and fired a shot at the cab, striking the passenger door.

Bunyarko immediately drove off. As he turned the corner of the street, Bunyarko observed two police officers in a patrol car. He reported the shooting incident to Police Officer John Kahmain and his partner. The officers then accompanied Bunyarko back to the scene. At the 1020 Grand Concourse address, Officer Kahmain approached the doorman and, following a brief conversation, proceeded upstairs with his partner and Bunyarko to apartment 16V.

When they reached the apartment, Officer Kahmain announced he was a police officer and began knocking and ringing the bell. The door's peephole opened briefly, but then shut. There was no further response from the occupants of the apartment for approximately ten minutes, at which time the door opened. Officer Kahmain went inside and observed four individuals: a woman, a child, and two men, one of whom was petitioner Bentley. Bentley was overheard talking to his attorney on the telephone about search warrants. The other man in the apartment was Bentley's son. Bunyarko quickly identified Bentley as the shooter, and Bentley was arrested. The other individuals in the apartment were then allowed to leave. Officer Kahmain escorted Bentley downstairs in handcuffs. Once outside, the police officers discovered a spent bullet casing from a nine

---

* Hon. William M. Skretny, District Judge of the United States District Court for the Western District of New York, sitting by designation.

millimeter pistol on the sidewalk in front of the building. They also noted a bullet hole in the cab's door. Bunyarko accompanied the officers to the police station, where the door to the taxi cab was disassembled and a lead bullet fragment was recovered.

The next morning, Police Officer Larry Coyle and his partner were assigned to safeguard apartment 16V. At approximately 8:30 a.m., Officer Coyle searched the roof of the garage directly beneath Bentley's apartment, where he discovered a burst paper bag containing (1) two plastic bags of nearly four ounces of heroin, (2) three guns, one of which was a fully loaded nine millimeter pistol, and (3) ammunition for the guns.

The officers took the items to the police station for examination. Police Officer Robert Seebach, assigned to the New York Police Department Ballistics Unit, tested the three guns and determined that only the nine millimeter pistol was operable. He noted that the inoperable condition of the other two pistols was consistent with being damaged by a fall from a significant height. In addition, Seebach noted that while only the two damaged pistols showed signs of having been fired, the condition of the nine millimeter pistol was consistent with that of a gun which had been cleaned following discharge.

Another member of the New York Police Department Ballistics Unit, Detective George Simmons, examined the bullet casing found on the sidewalk outside Bentley's apartment building and the bullet fragment recovered from inside the door panel of Bunyarko's taxi cab. Although the fragment found in the car door was too deformed to compare, Simmons determined that the bullet casing found on the sidewalk had been fired from the nine millimeter pistol recovered from the garage roof. Finally, New York Police Department Chemist Joseph Diep examined the white powder in the plastic bags and on the guns recovered by Officer Coyle. He concluded that the powder was approximately 3½ ounces of heroin.

On January 9, 1980, a Bronx County grand jury returned an indictment charging Bentley with (1) attempted murder in the second degree, (2) criminal possession of a weapon in the second degree and fourth degree, (3) reckless endangerment in the first degree, and (4) criminal possession of a controlled substance in the second degree. The State introduced detailed evidence at trial concerning the ballistics of the alleged weapon, the drugs recovered from the garage rooftop, and Bunyarko's eyewitness identification of Bentley as his assailant. During summation the prosecutor made the following comments:

> He pops a shot at him and tries to kill him. And then he realized how stupid and he runs upstairs and that's when the thinking starts setting in. *Remember the testimony Joseph said that one of them was on the phone to the lawyer about not searching the apartment.* Very smart.

> Did you notice that the gun, the nine millimeter had no powder residue, no discharge? He cleaned it. Very smart. The other guns, the two of them had evidence of discharge. Isn't that curious? The other two guns are dirty. Yet this one particular gun is cleaned. That's another thing I thought counsel might hit on. How do you know this gun was fired? It was recovered fully loaded, therefore it couldn't have been fired? Surprised he didn't mention that. Roosevelt had a lot of nine millimeter ammunition. He reloaded the gun. So when it was found it was no evidence of discharge. There was no round of ammunition missing.

> *Very intelligent act and very deliberate; the very same type of man is calling to a lawyer while the cops are knocking on the door.* The same type of man that would jettison everything from the apartment because then you can come in and say hey, nobody saw me with the drugs. How can you accuse me of this? No one saw me drop the drugs.

(emphasis added).

On February 17, 1982, a jury found Bentley guilty of attempted murder in the second degree and criminal possession of a controlled substance in the second degree. On October 29, 1982, New York State Supreme Court, Bronx County, rendered a judgment of conviction against Bentley and sentenced him to two concurrent prison terms of 12½ to 25 years, both terms consecutive with a pre-

vious federal prison sentence. Bentley has since made several attempts in both state and federal court to have his conviction set aside.

### B. Procedural History

The district court opinion details the extensive procedural history of this case in the state courts. *Bentley v. Scully,* 851 F.Supp. 586 (S.D.N.Y.1994). The issues presented on this appeal all relate to whether statements made by the prosecutor during summation violated Bentley's Sixth Amendment right to assistance of counsel, depriving him of a fair trial.

On November 9, 1982, Bentley filed a notice of appeal seeking review of the trial court's October 29, 1982, denial of his motion to dismiss the indictment on speedy trial grounds. The Appellate Division granted Bentley leave to appeal and consolidated the appeal with Bentley's appeal from the judgment of conviction. On July 25, 1985, the Appellate Division modified the trial court's judgment. Specifically, the court affirmed the second degree attempted murder charge and reversed the conviction for criminal possession of a controlled substance. The Appellate Division rejected Bentley's claim that his conviction be set aside in its entirety because of the prosecutor's references in summation to the fact that Bentley had been on the telephone with his attorney when the police entered his apartment.

Bentley has challenged his conviction in federal court on numerous and complex grounds. He has filed five federal habeas corpus petitions. He filed the first three in May 1982, April 1986, and March 1991. Each of these three petitions was dismissed without prejudice for failure to exhaust state remedies. Bentley filed his "fourth" petition on July 7, 1992. The court denied this petition on December 29, 1992, for failing to establish a discernable basis for relief. Bentley's "fifth" and present petition was submitted to the Pro Se Office of the Southern District of New York on April 9, 1992, but was not officially filed until July 8, 1992, at which time it was simultaneously dismissed *sua sponte* on the ground that it essentially duplicated the claims raised in the third peti-

tion. Bentley then filed a motion pursuant to Federal Rule of Civil Procedure 59 seeking reconsideration of the order of dismissal. The motion was granted in view of two considerations: (1) at the time of the dismissal order the appeal on the third petition was still pending, and this Court had since ruled to affirm the district court's determination that the petition must be dismissed for failure to exhaust; and (2) that since the filing of the third petition, Bentley had returned to state court and exhausted all the claims presented in the "fifth" petition.

The State eventually filed a motion to dismiss the petition as an abuse of the writ. The district court rejected the State's abuse of writ argument and concluded that, at last, Bentley had properly placed a habeas petition before the court for consideration on its merits. Thereafter, the district court filed an Opinion dated May 11, 1994, which granted Bentley a writ of habeas corpus and set aside his conviction for attempted second degree murder. However, Bentley remains incarcerated as a result of this Court's Order of June 28, 1994, granting the State's motion to stay execution of the district court's judgment.

### DISCUSSION

The district court discussed extensively whether Bentley's petition should be dismissed for abuse of the writ, as well as whether he was procedurally barred from presenting his claim to the district court due to his failure to make a contemporaneous objection at trial to the prosecutor's summation. On both issues, the district court ruled in Bentley's favor. On appeal, we need not address those issues, because the error Bentley claims in any event had no substantial or injurious effect or influence on the jury's verdict.

In reviewing the merits of Bentley's claim that his conviction should be set aside because of improper comments by the prosecutor, the district court concluded that the prosecutor's comments in summation—concerning Bentley's speaking by phone to his lawyer about the search of his apartment—impermissibly abridged his right to consult

with counsel, and did not constitute "harmless error under the circumstances of this trial." *Bentley,* 851 F.Supp. at 603. The district court, however, failed to employ the proper legal standard for determining harmless error, as announced by the Supreme Court in *Brecht v. Abrahamson,* —— U.S. ——, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

■ In *Brecht,* the Supreme Court clarified that a different "harmless error" standard applies when a federal court conducts a habeas review of a conviction—a form of collateral review—than when the conviction is subject to direct review by the federal court. In pertinent part, the Supreme Court stated:

> In *Chapman v. California* ... we held that the standard for determining whether a conviction must be set aside because of federal constitutional error is whether the error "was harmless beyond a reasonable doubt." In this case we must decide whether the *Chapman* harmless-error standard applies in determining whether ... [prosecutorial misconduct] entitles petitioner to habeas corpus relief. We hold that it does not. Instead, the standard for determining whether habeas relief must be granted is whether the ... error "had substantial and injurious effect or influence in determining the jury's verdict."

*Id.,* —— U.S. at ————, 113 S.Ct. at 1713–14 (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)) (other citations omitted).[1] While this Court's recent decisions involving habeas petitions have applied the *Brecht* rule, *see, e.g., Latine v. Mann,* 25 F.3d 1162, 1167 (2d Cir.1994); *Henry v. Speckard,* 22 F.3d 1209, 1215 (2d Cir.1994), we now endeavor to explain the rationale for the rule due to the district court's apparent problematic reliance on decisions of this Court involving direct review of trial court convictions, rather than those involving habeas petitions.[2]

■ In reaching its conclusion, the Supreme Court noted that the distinctions between collateral review and direct review of criminal convictions "resound[ ] throughout our habeas jurisprudence." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1719.[3] "Direct review is the principle avenue for challenging a conviction ... [and when this process] 'comes to an end, *a presumption of finality and legality* attaches to the conviction and sentence.' " *Id.* (quoting *Barefoot v. Estelle,* 463 U.S. 880, 887, 103 S.Ct. 3383, 3392, 77 L.Ed.2d 1090 (1983)) (emphasis added). Thus, while federal habeas proceedings are important to ensure that constitutional rights are observed, their role is "secondary and limited." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1719.

1. In *Brecht,* the Supreme Court also reaffirmed the distinction between two broad types of constitutional violations that may occur in a criminal trial: structural error and trial error. A "structural error" requires automatic reversal and is not subject to harmless error analysis because it involves a deprivation of a constitutional protection so basic that in its absence, " 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair.' " *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (citations omitted), *reh'g denied,* 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 472 (1991). A "trial error," on the other hand, is one which occurred during the presentation of the case to the jury and, as such, may be quantitatively assessed in the context of other evidence presented to determine whether it was harmless. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1717. The asserted error in this case was of the trial type and, therefore, it will be relevant to assess its effect under the *Brecht* standard.

2. Specifically, the district court cited our decision in *United States v. Matthews,* 20 F.3d 538, 551 (2d Cir.1994), as identifying "the standard of review for improper prosecutorial remarks at summation." *Bentley,* 851 F.Supp. at 600–01. However, *Matthews* involved a direct appeal from a criminal conviction in federal district court. While *Matthews* does identify factors that are relevant to consider in assessing the merits of a habeas petition, the "standard of review" applied therein is far less deferential than that to be applied in a habeas case.

3. Our prior decisions also reflect recognition of this distinction. Much like the Supreme Court prior to *Brecht,* we have applied the standards for direct review of a trial court conviction in the habeas context, but never had occasion to squarely address the question of whether such an approach was proper. *See, e.g., Floyd v. Meachum,* 907 F.2d 347, 355 (2d Cir.1990). Regardless, our present analysis is now to be guided by the teachings of *Brecht.*

The Supreme Court then explained that this deferential approach to collateral review is consistent with the historic role of the writ as an extraordinary remedy to afford relief for grievous wrongs. *Id.* at ——, 113 S.Ct. at 1719–20. It reasoned that " 'federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.' " *Id.* at ——, 113 S.Ct. at 1720. In light of the foregoing considerations, the Supreme Court concluded by noting that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Id.* (internal quotation omitted); *see also Robinson v. Arvonio,* 27 F.3d 877, 883–85 (3d Cir.1994), *reh'g, denied,* (3d Cir. July 14, 1994); *Starr v. Lockhart,* 23 F.3d 1280, 1291–92 (8th Cir.1994), *reh'g, denied,* (8th Cir. June 10, 1994) (discussing the distinct harmless error analyses used depending on whether review is direct or collateral and the reasons therefore).

■■■ Consistent with the greater deference accorded to a final state court judgment on collateral federal review, the *Brecht* decision also shifted the burden of proof in habeas cases. In conducting a direct review, *Chapman* dictates that the State bears the burden of proving harmless error beyond a reasonable doubt; however, in the habeas context, petitioners "are not entitled to habeas relief based on trial error *unless they can establish* that it resulted in 'actual prejudice.' " *Brecht,* —— U.S. at ——, 113 S.Ct. at 1722 (citing *United States v. Lane,* 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986)) (emphasis added). Moreover, interpreting this statement as placing the burden of proof on petitioners is consistent with the Supreme Court's statement in *Brecht* that once the "process of direct review ... comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Brecht,* —— U.S. at ——, 113 S.Ct. at 1719; *see also Hardnett v. Marshall,* 25

F.3d 875, 880 (9th Cir.1994) (citing factors which support the interpretation that *Brecht* shifted the burden of proof to petitioners, but declining to resolve the issue). Thus, although this Court has found it unnecessary to reach this conclusion on prior occasions, *see Ayala v. Leonardo,* 20 F.3d 83, 90–91 (2d Cir.1994), we now specifically hold that the language of the *Brecht* opinion places the burden on the petitioner rather than the State.[4]

■■■ In sum, *Brecht* dictates that in order to be entitled to habeas relief, Bentley must demonstrate that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict. Habeas relief is not appropriate when there is merely a "reasonable possibility" that trial error contributed to the verdict. *Brecht,* —— U.S. at ——, 113 S.Ct. at 1721 (internal quotation omitted). In assessing whether this standard has been met, it is relevant to consider a host of factors which include: (1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct. *See Gonzalez v. Sullivan,* 934 F.2d 419, 424 (2d Cir.1991). Although these considerations were identified in our habeas jurisprudence prior to *Brecht,* they remain relevant for the ultimate inquiry of whether a petitioner has shown "actual prejudice" in light of the totality of the circumstances surrounding the trial court conviction. *See Samuels v. Mann,* 13 F.3d 522, 526–27 (2d Cir.1993); *Henry,* 22 F.3d at 1215–16.

Although the district court properly noted that "[t]he standard for reversal of a criminal conviction based on improper prosecutorial comments is extremely high," *Bentley,* 851 F.Supp. at 599, several aspects of its decision suggest that its analysis was not consistent with the deferential standard of review recognized in *Brecht.* Our task is to determine

---

4. Justice Stevens' concurring opinion in *Brecht* asserts that prosecutors should bear the burden to establish that a constitutional error is harmless. *Brecht,* —— U.S. at —— – ——, 113 S.Ct. at 1723–24. Nevertheless, the majority of circuit courts faced with this question have, consistent with our statement herein, either expressly or implicitly interpreted *Brecht* as placing the burden of proof on petitioners. *See Robinson,* 27 F.3d at 885–86 n. 6 (holding that burden of proof is on petitioners and compiling cases which address the *Brecht* burden of proof issue).

whether Bentley's petition was properly granted. Applying the *Brecht* standard to the facts of this case *de novo, see Ayala,* 20 F.3d at 91, we find that Bentley's petition must be dismissed.

 The evidence of guilt introduced by the prosecution in this case was overwhelming. First, Bunyarko made an eyewitness identification of Bentley as the gunman almost immediately after the shooting. While the district court noted that Bunyarko did not previously know Bentley and did not have a substantial opportunity to view him, we do not believe, in light of the totality of circumstances, that this undermines the reliability or probative value of the identification. Further, the police recovered a nine millimeter pistol on the rooftop directly below the window of Bentley's apartment. The location of the pistol alone contradicts the district court's conclusion that there was no evidence "to link the alleged assault weapon, recovered on a neighboring rooftop, with Bentley or the apartment in which he was arrested." *Bentley,* 851 F.Supp. at 601. In addition, a ballistic expert found that the spent nine millimeter bullet casing recovered from the scene of the shooting was fired from the pistol found on the rooftop. Unlike the district court, we do not believe that the evidence against Bentley is at all undermined by the fact that the Appellate Division set aside his drug conviction. That court determined that there was insufficient evidence to establish constructive possession of the drugs, but nonetheless affirmed Bentley's attempted murder conviction.

Because of the compelling evidence in the prosecution's case against Bentley, as well as the fact that the prosecutor's summation comments were both brief and isolated, we find that Bentley has failed to demonstrate that the prosecutor's misconduct had a substantial or injurious effect or influence on the jury's verdict. Absent a showing of "actual prejudice," we conclude that the error was harmless.

## CONCLUSION

For the reasons stated above, the judgment of the district court is hereby VACATED and the case REMANDED with direction to dismiss the petitioner's writ.