Charles E. **FRIEDGOOD,** Petitioner,

v.

**John P. KEANE, Superintendent, Sing Sing Correctional Facility,** Respondent.

No. CV 94–5894(ADS).

United States District Court, E.D. New York.

June 14, 1999.

Charles E. Friedgood, Ossining, New York, petitioner pro se.

Office of the Nassau County District Attorney, Mineola, New York, by Bruce E. Whitney, Assistant District Attorney, Tammy J. Smiley, Assistant District Attorney, of counsel, for the respondent.

### MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

The *pro se* habeas corpus petitioner, Charles E. Friedgood ("Friedgood" or the "petitioner"), filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, in which he claimed the following six grounds for relief: (1) the prosecution failed to prove his guilt beyond a reasonable doubt; (2) prosecutorial misconduct; (3) the trial court erroneously refused to admit certain defense testimony to refute the prosecutor's improper statements concerning the petitioner's motive; (4) the trial court erroneously refused to instruct the jury concerning the time of death; (5) juror misconduct; and (6) ineffective assistance of trial counsel.

In a Report and Recommendation dated March 16, 1999, United States Magistrate Judge Viktor V. Pohorelsky recommended that Friedgood's petition be denied in its entirety. Friedgood filed objections to the Magistrate Judge's Report and Recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), any party may file written objections to the Report and Recommendation of the Magistrate Judge. *See also* Fed.R.Civ.P. 72(a). Where, as here, objections have been filed, the district court is required to make a *de novo* determination as to those portions of the Report and Recommendation to which objections were made. *See* 28 U.S.C. § 636(b)(1); *Grassia v. Scully*, 892 F.2d 16, 19 (2d Cir.1989).

The Court has carefully reviewed the record in the case, the parties' submissions, Judge Pohorelsky's thoughtful, detailed and thorough Report and Recommendation, as well as the petitioner's objections, and concurs with Judge Pohorelsky's recommendations for the reasons set-forth in his well-reasoned Report.

Accordingly, it is hereby

**ORDERED,** that the Court adopts the Report of United States Magistrate Judge Viktor V. Pohorelsky, dated March 16, 1999, recommending that Friedgood's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be denied; and it is further

**ORDERED,** that Friedgood's petition for a writ of habeas corpus is denied in its entirety; and it is further

**ORDERED,** that the Clerk of the Court is directed to close this case.

**SO ORDERED.**

### REPORT AND RECOMMENDATION

POHORELSKY, United States Magistrate Judge.

The petitioner, Charles Friedgood, brings this *pro se* habeas corpus petition

pursuant to Section 2254 of Title 28 of the United States Code seeking to have his New York State murder conviction vacated and the indictment dismissed. The petitioner argues that his conviction was obtained in violation of his rights pursuant to the Sixth and Fourteenth Amendments of the United States Constitution. For the reasons set forth below, the undersigned REPORTS and RECOMMENDS that his petition for a writ of habeas corpus be DENIED.

## FACTUAL BACKGROUND

The petitioner Charles Friedgood is a medical doctor who was convicted of murdering his wife, Sophie Friedgood. On June 17, 1975, at approximately 10:00 p.m., the petitioner and his wife returned home from an evening of dining out. Sophie spoke to their daughter on the telephone around 11:00 p.m. that same night, the last time any of her children spoke with her. On June 18, 1975, at 1:30 p.m., Sophie was found dead in her bedroom by the family's maid. The official cause of death was eventually determined to be by lethal injections of Demerol.

On the day his wife's death was discovered, acting in a physician's capacity, Friedgood signed his wife's death certificate, listing the cause of death as a non-traumatic cerebral hemorrhage. In spite of his family's requests for an autopsy, Friedgood had his wife's body removed from Nassau County to Pennsylvania for burial. On June 19, 1975, members of the Nassau County Police Department traveled to Pennsylvania and requested that the body be returned to Nassau County for an autopsy. Friedgood consented to the request. An initial autopsy revealed that Sophie died from a lethal dose of Demerol. Several weeks later, a second autopsy disclosed multiple injection sites where the Demerol was administered, as well as ten ounces of food in Sophie's stomach. The latter fact led the medical examiner to the conclusion, later hotly disputed at trial, that Sophie died no later

than four to six hours after her last meal, which had been eaten between 7:00 and 8:00 p.m. on June 17.

On June 22, 1975, officers from the Nassau County Police Department executed a search warrant at the Friedgood home in search of various items including Demerol, syringes, needles, and Empirin. At Friedgood's request, his daughter surreptitiously removed a bottle of Demerol, a syringe, Empirin tablets, and Codeine pills from an upstairs file cabinet before the police search. The police never recovered these items. During the next few days, by forging his wife's signature the petitioner looted his wife's assets at various safe deposit boxes, and purchased a one-way ticket to London, while at the same time telling his daughters that he was going to a motel for a few days to relax. On the evening of June 25, the police found the petitioner on board a flight to London in possession of cash, stocks, bonds, and jewelry belonging to Sophie, with a combined value of approximately $725,000. The petitioner voluntarily disembarked and went to police headquarters for questioning. He explained the situation as an attempt to hide his wife's assets from the Internal Revenue Service. Police investigation later determined that for years before his wife's death, Friedgood had carried on an affair with one of his nurses. Some three months before Sophie's death, the nurse had returned to her native Denmark with her two children, both fathered by Friedgood.

Friedgood was subsequently arrested, and after a jury trial, he was convicted on December 15, 1976 of Grand Larceny in the Second Degree and Murder in the Second Degree for the deliberate slaying of his wife, Sophie Friedgood. On January 27, 1977, the petitioner was sentenced to a maximum of seven years imprisonment on the grand larceny conviction and twenty-five years to life on the murder conviction.

He timely appealed his conviction claiming, among other things, (1) that the State

did not prove guilt beyond a reasonable doubt; (2) that the prosecution committed misconduct by (a) wrongfully testifying at the petitioner's pretrial suppression hearing (b) adducing testimony concerning a missing bottle of Demerol in bad faith (c) improperly adducing testimony regarding the petitioner's refusal to speak to the police without the presence of his counsel, and (d) improperly asserting personal knowledge and opinions to the jury in the summation; (3) that the trial court erred in refusing to allow the defense to introduce evidence to refute improper arguments made by the prosecutor that the petitioner was the only person with a motive to murder the victim; and (4) that the trial court's refusal to charge the jury concerning time of death violated his right to due process. Friedgood's conviction was affirmed in *People v. Friedgood,* 63 A.D.2d 972, 406 N.Y.S.2d 695 (2d Dep't. 1978), and his motion for leave to appeal was denied. 45 N.Y.2d 780, 409 N.Y.S.2d 1037, 381 N.E.2d 172 (1978).

In 1980, the petitioner filed his first motion to vacate his judgment of conviction pursuant to section 440.10 of New York Criminal Procedure Law. On that motion, the petitioner asserted a new claim of prosecutorial misconduct alleging, that the prosecutor (a) coerced a potential defense witness, (b) misused a grand jury subpoena, and (c) withheld exculpatory evidence from the grand jury. In addition, the petitioner raised claims of juror misconduct and of misrepresentations and perjury by the state's expert witness. The court denied the motion to vacate his conviction by order dated May 4, 1980. *People v. Friedgood,* No. 75–43049, slip op. at 4 (N.Y.Crim.Ct.1980). The Appellate Division affirmed the decision in *People v. Friedgood,* 85 A.D.2d 698, 449 N.Y.S.2d 643 (2d Dep't 1981), and granted the petitioner leave to appeal to the New York

Court of Appeals, which unanimously affirmed the decision in *People v. Friedgood,* 58 N.Y.2d 467, 462 N.Y.S.2d 406, 448 N.E.2d 1317 (1983).

In 1992, the petitioner moved for the second time to vacate his conviction, this time on grounds of ineffective assistance of trial counsel. The County Court denied his motion on both procedural and substantive grounds by order dated December 30, 1992 and, further, denied leave to appeal to the Appellate Division.

The petitioner now raises six separate and distinct claims for relief in the habeas petition presented to this court. These claims, one of which encompasses eight sub-claims, are (1) failure to prove guilt beyond a reasonable doubt; (2) prosecutorial misconduct, which includes (a) wrongfully testifying at the petitioner's pre-trial suppression hearing; (b) adducing testimony regarding a missing bottle of Demerol in bad faith; (c) wrongfully proffering testimony concerning the petitioner's refusal to speak to the police without his counsel present; (d) making improper statements in arguments to the jury; (e) coercing a potential defense witness; (f) misusing a grand jury subpoena; (g) withholding exculpatory evidence from the grand jury; and (h) offering testimony from an expert witness who misrepresented critical facts and gave false testimony; (3) the trial court's erroneous refusal to admit defense testimony to refute the prosecutor's improper statements about the petitioner's motive;[1] (4) the trial court's erroneous refusal to charge the jury concerning the time of death; (5) juror misconduct; and (6) ineffective assistance of counsel.

## DISCUSSION

### I. PROCEDURAL LAW

Section 2254 of Title 28, United States Code provides:

explained in detail below, the trial court excluded evidence offered by the petitioner relating to an argument made by the prosecution that the petitioner was the only person with a motive to kill the decedent.

---

**1.** This claim is listed in the petitioner's memorandum of law as a sub-claim of his prosecutorial misconduct claim, but the court reviews it as a challenge to a trial court evidentiary ruling, which is how it was presented to the state court on direct appeal. Specifically, as

[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.

28 U.S.C. § 2254.

The district court must consider a *pro se* litigant's petition for a writ of habeas corpus liberally. *Cuadra v. Sullivan,* 837 F.2d 56, 59 (2d Cir.1988). In evaluating the state prisoner's habeas corpus petition, it is the court's role to determine whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." *Coleman v. Thompson,* 501 U.S. 722, 730, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *See* 28 U.S.C. § 2254.

### A. *The Exhaustion Requirement*

"The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). A petitioner must exhaust all available avenues of review by the state courts before a federal court may consider an application for habeas relief on the merits. *See Caballero v. Keane,* 42 F.3d 738, 740 (2d Cir.1994).

The Second Circuit has set forth a two-pronged test to determine whether the petitioner has exhausted available state remedies. *Velez v. People of State of New York,* 941 F.Supp. 300, 309 (E.D.N.Y.1996). The first prong requires that the grounds for relief must have been "fairly presented" to the state courts. *Reid v. Senkowski,* 961 F.2d 374, 376 (2d Cir.1992). To satisfy this prong, the petitioner "'must have informed the state court of both the factual and legal premises of the claim he asserts in federal court.'" *Lebron v. Mann,* 40 F.3d 561, 567 (2d Cir.1994) (quoting *Daye v. Attorney Gen'l of New York,* 696 F.2d 186, 191 (2d Cir.1982) (*en banc*)). The Second Circuit applies this standard liberally. *See, e.g., Reid,* 961 F.2d at 376. A habeas petitioner is not required to cite "chapter and verse" of the Constitution. *Daye,* 696 F.2d at 194. The ways in which a petitioner may fairly present to the state courts the constitutional nature of his claim include (a) reliance on pertinent federal cases employing constitutional analysis; (b) reliance on state cases employing constitutional analysis in like fact situations; (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution; or (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation. *Id.*

The second prong generally requires that the habeas applicant "present ... the substance of his federal claims to the highest court of the pertinent state," *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994), unless state collateral review is subsequently available, in which case a petitioner must first collaterally attack his conviction in the state court. *Dorsey v. Irvin,* 56 F.3d 425, 426 (2d Cir.1995).

Ordinarily, if a prisoner has not satisfied the exhaustion requirement pursuant to Section 2254, the petition must be dismissed. *See Rose,* 455 U.S. at 513, 102 S.Ct. 1198. Although the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amendments to Section 2254 now permit a court to deny a petition for habeas relief on the merits even when complete exhaustion has not occurred, *e.g., Kelly v. Keane,* No. 96 Civ. 1742, 1996 WL 640892, at *2 (S.D.N.Y. Nov. 4, 1996), the amendment does not apply in non-capital cases that were already pending when the Act was passed. *See, e.g., Lindh v. Murphy,* 521 U.S. 320, 117 S.Ct. 2059, 2061–62, 138 L.Ed.2d 481 (1997). Since the petitioner here filed his petition prior to the enactment of the AEDPA, the "total exhaustion requirement" applies in this case. *Rose,* 455 U.S. at 513, 102 S.Ct. 1198. Therefore, if any claim in the original peti-

tion is not exhausted, the petition must be entirely dismissed.

The petition at issue contains six claims and eight sub-claims. All of these claims were raised either on the petitioner's direct appeal or in his post-judgment motions and, therefore, all of the petitioner's claims are exhausted.

### B. Independent and Adequate State Grounds—Procedural Bar

■■■■ In addition to satisfying the exhaustion requirement, a habeas petitioner must also demonstrate the absence of an independent and adequate state ground for the state court's denial of the claim. Where the state court bases its denial of a claim "on a state law ground that is independent of the federal question and adequate to support the judgment," the federal court is precluded from reviewing the claim. *Coleman*, 501 U.S. at 729–30, 111 S.Ct. 2546. This rule applies equally to substantive and procedural state law grounds. *Id.* Thus, habeas review is barred where the "last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Reid*, 961 F.2d at 377. A state procedural bar may arise through a "failure to make a timely appeal, or through a failure to preserve a claim of appeal through contemporaneous objection." *Bacchi v. Senkowski*, 884 F.Supp. 724, 731 (E.D.N.Y.1995). Where there exists an independent and adequate state ground, the federal court is prohibited from reviewing that claim unless the petitioner can (1) show cause for the default and prejudice resulting therefrom *or* (2) demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Id.* at 731 (citing *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)).

In this case, as set forth below, the state courts denied a number of the petitioner's claims on the independent and adequate state grounds that they were procedurally barred.

### 1. The Petitioner's First Motion to Vacate Conviction

■■■ The petitioner's first post-judgment motion to vacate his conviction presented to the state courts five of the claims he has made here. All were denied on procedural grounds. *See People v. Friedgood*, 85 A.D.2d 698, 449 N.Y.S.2d 643 (2d Dep't 1981), *aff'd*, 58 N.Y.2d 467, 462 N.Y.S.2d 406, 448 N.E.2d 1317 (1983). Those claims include his claim of juror misconduct and four of the sub-claims of prosecutorial misconduct made here, specifically (1) coercion of a potential defense witness, (2) misuse of a grand jury subpoena, (3) withholding exculpatory evidence from the grand jury, and (4) offering perjured expert testimony.

The Appellate Division denied each of the above claims and the Court of Appeals affirmed. In its ruling, the Court of Appeals held, among other things, that three of the claims of prosecutorial misconduct were procedurally barred because the petitioner had failed to make the requisite showing of due diligence required by section 440.10(3)(a) of New York's Criminal Procedure Law, and had failed sufficiently to allege that he was prejudiced by the supposed prosecutorial misconduct. *People v. Friedgood*, 58 N.Y.2d 467, 471–72, 462 N.Y.S.2d 406, 448 N.E.2d 1317 (1983). Similarly, the Court of Appeals affirmed the denial of the petitioner's claim of juror misconduct because of his failure to satisfy the due diligence requirement. *Id.* at 472–73, 462 N.Y.S.2d 406, 448 N.E.2d 1317. In addition, the Court of Appeals found this claim procedurally defective because it was based, with but one exception, entirely on hearsay. *Id.* at 473, 462 N.Y.S.2d 406, 448 N.E.2d 1317.

Although the Court of Appeals also affirmed the denial of the petitioner's claim based on supposed perjury by one of the prosecution's experts, the question whether that decision was based on a procedural bar requires scrutiny of the lower court's decision on the motion, because the Court

of Appeals affirmed .on the ground that it was powerless to upset the trial court's exercise of discretion on the issue. *Id.* at 473, 462 N.Y.S.2d 406, 448 N.E.2d 1317. Before the trial court, the petitioner contended, as he does here, that the prosecution's rebuttal medical expert, Dr. Milton Helpern, misrepresented critical matters in his testimony concerning the time of the victim's death. Specifically, Dr. Helpern's opinion concerning the victim's time of death was based in part on the victim's stomach contents and in part on the extent of rigor mortis in the victim's body when it was discovered. In memoirs published a year or so after this testimony, however, Dr. Helpern made statements which appear to question the reliability of stomach contents in fixing the time of death. *See* App. to Resp't Brief on Appeal to 2d Dept. from Denial of First Motion to Vacate, at 118–21.

The lower court treated the petitioner's claim based on these possible contradictions between Dr. Helpern's trial testimony and his memoirs as a claim based on newly discovered evidence. Under section 440.10(1)(g) of the New York Criminal Procedure Law, however, such claims are barred unless the evidence could not have been produced by the defendant at the trial with exercise of due diligence. The court concluded that the petitioner had failed to exercise due diligence because he had not cross-examined the prosecution's expert on the unreliability of stomach content in fixing time of death, even though the petitioner had previously produced in his defense case testimony from his own expert witnesses on precisely that issue. Accordingly, the court concluded that the petitioner's claim was procedurally barred.

The petitioner questions how the state court could conclude that he failed to exercise due diligence in producing the newly discovered evidence at trial in view of the fact that Dr. Helpern's memoirs did not even exist at the time of trial. The argument misperceives the nature of the newly discovered evidence. The newly discover-

ed evidence is actually material which could have been used to impeach Dr. Helpern, but only if he had stated on cross-examination that stomach content *alone* was a reliable means of establishing time of death. If, in the exercise of due diligence, questions on that subject had been asked on cross-examination, the petitioner may well have learned from Dr. Helpern what was later published in his memoirs, i.e., that stomach content alone is not a reliable means of establishing time of death. In other words, Dr. Helpern's opinion that stomach content alone is *not* a reliable indicator of time of death, as later published in his memoirs, may well have been his opinion at the time he gave his testimony, and that evidence was clearly available to the defense when they cross-examined him. By failing to ask questions of Dr. Helpern concerning the reliability or unreliability of stomach content as an indicator of time of death, the petitioner effectively waived any claim that later statements made by Dr. Helpern on that point might have been inconsistent with his trial testimony.

For substantially the same reasons, even if this court were to find that the claim was not procedurally barred, it is nevertheless meritless. The later published statements attributed to Dr. Helpern that stomach content *alone* is not a reliable indicator of time of death are not necessarily inconsistent with his trial testimony, because he did not so testify at trial and his testimony clearly relied on several factors; including stomach content, in establishing time of death. Because there is no clear inconsistency, Dr. Helpern's later statements do not give rise to a claim that his trial testimony was perjured. Similarly, to the extent that the petitioner is now claiming that the prosecutor knowingly elicited perjured testimony when he called Dr. Helpern to testify, such a claim is meritless because the petitioner has not established a reasonable basis to infer that perjury was committed. In any event, the petitioner offers no proof that the prosecutor

had any knowledge, at the time of trial, of the views later published by Dr. Helpern.

### 2. *The Petitioner's Second Motion to Vacate Conviction*

 In his second motion to vacate his conviction, made some fourteen years after his conviction, the petitioner raised for the first time a claim of ineffective assistance of counsel. The state court denied any relief on that claim, holding that the facts upon which it was based were known to the petitioner at the time of trial, at the time of his direct appeal, and at the time of his first motion to vacate his conviction, all of which provided grounds to bar his claim procedurally under the provisions of section 440.10(2) and (3) of the New York Criminal Procedure Law. The Appellate Division denied leave to appeal from that ruling.

For the foregoing reasons, the court concludes that the above-described state court rulings barring, for valid procedural reasons, the petitioner's claims based on juror misconduct and ineffective assistance of counsel, as well as the claim of prosecutorial misconduct insofar as it rests on (1) coercion of a potential defense witness, (2) misuse of a grand jury subpoena, (3) withholding of exculpatory evidence from the grand jury, and (4) alleged perjury by the prosecution's rebuttal expert, constitute independent and adequate state grounds which prevent this court from granting habeas relief on those claims absent a showing of cause and prejudice or a miscarriage of justice.

### C. *Cause and Prejudice or Miscarriage of Justice*

 The court below examines whether the petitioner has established either cause and prejudice with respect to the claims that are procedurally barred or a fundamental miscarriage of justice. *See, e.g., Harris,* 489 U.S. at 262, 109 S.Ct. 1038. A finding that a petitioner has cause for the default generally requires a showing of some objective factor external to the petitioner which impeded counsel's

efforts to comply with the state's procedural rule. *See, e.g., Murray v. Carrier,* 477 U.S. 478, 487, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). To establish prejudice the petitioner must show "not merely that the errors at ... trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *Id.* at 493–94, 106 S.Ct. 2639. Absent a showing of cause and prejudice, a petitioner may obtain review of his claims only by showing that a fundamental miscarriage of justice will result without such review. A miscarriage of justice occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Washington v. James,* 996 F.2d 1442, 1447 (2d Cir.1993). This standard requires the petitioner to show by clear and convincing evidence that, but for the constitutional error, no reasonable juror would have found him guilty. *Id.*

### (1) *The Coerced Witness Prosecutorial Misconduct Claims*

 Three of the bases underlying the petitioner's claim of prosecutorial misconduct relate to the alleged coercion of a potential defense witness, Binnie Lazarus. Shortly after Sophie's death, police questioned Lazarus in the presence of the petitioner's attorney. She said she thought she had spoken to the victim on the morning of June 18, 1975, but that she was not certain whether it was that morning or the preceding morning. Later, Lazarus was subpoenaed to appear before the grand jury. In a meeting with the prosecutor before she was scheduled to testify, Lazarus told the prosecutor about her conversation with the victim. After he warned her about the perils of perjury, Lazarus signed a statement saying that she was uncertain about the date of her morning conversation with Sophie. The prosecutor chose not to present her testimony to the grand jury, and neither the prosecution

nor the defense called her as a witness at trial.

Subsequently, in an affidavit submitted to the state court on the petitioner's first motion to vacate his conviction, Lazarus stated that the prosecutor coerced her into signing the statement. According to Lazarus's affidavit, had she not been coerced she would have testified that she spoke to the victim on the morning of the day her death was discovered. The petitioner now claims that the prosecutor misused a grand jury subpoena to bring Lazarus to his office, coerced her to sign the statement, and then failed to submit Lazarus's exculpatory testimony to the grand jury.

As stated above, the state court denied the petitioner's application for relief based on these allegations because of his failure to raise them timely. As the petitioner makes no attempt to show cause for his failure to raise these matters timely in accordance with New York's procedural rules, the court need not review whether prejudice occurred. The court therefore reviews these claims to determine whether the petitioner is able to demonstrate a fundamental miscarriage of justice, that is, that the alleged improprieties probably resulted in the conviction of one who is actually innocent. *See James,* 996 F.2d at 1447.

Unfortunately for the petitioner, the testimony Lazarus supposedly would have offered but for the prosecutor's coercion would have been subject to considerable impeachment given the uncertainty in her first statement to the police and defense counsel shortly after the murder and before the prosecutor interviewed her. Moreover, the petitioner introduced testimony from two other witnesses who said they spoke to the victim during the same morning, as well as testimony from the family maid about her observations of activities by the victim on the same morning. The testimony of the allegedly coerced witness would therefore have been cumulative and, since it was equivocal, could hardly be considered pivotal. For the same reasons,

since the alleged misuse of a grand jury subpoena and withholding of exculpatory evidence from the grand jury related to the same supposedly coerced witness, those alleged instances of misconduct are not likely to have caused the conviction of someone who was actually innocent.

#### (2) *The Juror Misconduct Claim*

As to the claim of juror misconduct the petitioner similarly has not attempted to establish cause for his procedural default. When he made this claim to the state court in his initial motion to vacate, the petitioner's only explanation for failing to investigate and report promptly the alleged misconduct was that his attorney was busy preparing his appeal. *Friedgood,* 58 N.Y.2d at 473, 462 N.Y.S.2d 406, 448 N.E.2d 1317. The New York Court of Appeals found that the petitioner's "explanation, in light of defendant's three-year delay in bringing this motion, is insufficient, as a matter of law" to overcome the due diligence requirement. *Id.* This court finds no reason to disagree with that assessment, and concludes that the explanation is inadequate to establish cause. Moreover, the petitioner has offered no cause for his other procedural default, i.e., his failure to support his claim with non-hearsay affidavits. Because the petitioner has failed to establish cause for his non-compliance with state procedural rules, it is unnecessary to determine whether the alleged juror misconduct resulted in prejudice to the petitioner.

The petitioner attempts to establish that the alleged juror misconduct "unquestionably" resulted in a fundamental miscarriage of justice, but fails to substantiate this contention. Pet'r.Reply Mem. Supp. at 18–19. The alleged instances of juror misconduct include the following: (1) discussions among the jurors, including the alternates, concerning the evidence during the trial and before the jury retired to deliberate; (2) one or more jurors followed press and television coverage of the trial; (3) one juror discussed the case with his

wife after she visited the petitioner's home; (4) one juror consulted a medical book; and (5) one juror gave information to the jurors, based on his own experience, contrary to the evidence. Except for the last item, the petitioner fails to articulate with any specificity how any of the above alleged acts of misconduct probably caused any juror to reach a guilty verdict they would not otherwise have reached.

As to the fifth instance of misconduct, the petitioner alleges that one of the jurors, who had formerly worked for the telephone company, told the other jurors during deliberations that an item of telephone equipment could not have operated in the manner that a defense witness had testified. Specifically, the family maid, Lydia Fernandez, testified that while she was in the cellar on the morning of June 18, after the petitioner had left for work, she heard a telephone box in the cellar ring once. A picture of the telephone box was introduced by the defense as an exhibit. From this the jury could conclude that the victim had indeed received a telephone call from one of the other defense witnesses who testified that they had spoken to the victim that morning. The juror, Fred Lee, allegedly told the jury that, based on his telephone company experience, the telephone box in the picture could not ring. The petitioner now alleges that by making such statements Lee became an expert witness who urged the jury to decide matters contrary to the evidence.

The court is not persuaded by the petitioner's argument for at least three reasons. First, in relying on his own experience as a former telephone company employee, which was revealed to the defendant at the outset of trial through voir dire, Lee was doing precisely what jurors are instructed to do daily in courts throughout the country. *See, e.g.,* 1 L. Sand, J. Siffert, W. Loughlin & S. Reiss, *Modern Federal Jury Instructions* ¶ 7.01, at Instruction 7–1 (Matthew Bender 1998); 1A *New York Pattern Jury In-*structions, PJI 1:8 (West 3d ed.1998); *Pattern Criminal Jury Instructions of the District Judges Association of the Sixth Circuit,* Instruction No. 1.05 (1991).

More importantly, the petitioner has not provided any evidence that what Lee allegedly told his fellow jurors is incorrect. Thus there is no basis for the court to conclude that the information supposedly imparted to the jurors probably resulted in the conviction of a person who is actually innocent.

Finally, even if Lee's information were demonstrated to be incorrect, it is doubtful that it had any substantial impact on the jury's determination that the victim died much earlier in the day. Fernandez's testimony about hearing the telephone ring was impeached by evidence of other statements she made which contradicted that testimony. Moreover, the telephone ring supposedly heard by Fernandez was but one of four observations about which she testified concerning physical activity by the victim on the morning of June 18, and the prosecution was able to impeach all but one of the four with prior inconsistent statements made by Fernandez. See Resp't Brief to Court of Appeals dated January 14, 1983, at 21–25. The jury thus had ample evidence to reject Fernandez's testimony even without the information supposedly imparted by Lee.

For the foregoing reasons, the court concludes that the petitioner has failed to demonstrate that a fundamental miscarriage of justice resulted from any of the instances of alleged juror misconduct he has itemized. Consequently, this claim is precluded from federal habeas review.

### (3) The Ineffective Assistance of Counsel Claim

The petitioner's ineffective assistance claim rests on allegations that his trial counsel (1) was drunk and ill; (2) refused to allow the petitioner to testify in the face of his repeated requests to do so; (3) failed to cross-examine a prosecution witness on the reliability of stomach content as a de-

terminant of time of death; and (4) failed to rebut adequately contradictory and false testimony given by a prosecution witness. As with the prosecutorial misconduct and juror misconduct claims, the "cause" proffered by the petitioner to excuse his failure time to assert this claim in state court is insufficient. The petitioner's contention that his trial counsel's ineffectiveness caused the petitioner's default in raising these claims fails because the petitioner retained new counsel to file both his appeal and first motion to vacate his conviction, yet no claim of ineffective representation was made on either occasion. Rather, the first mention of ineffective representation was made on the petitioner's second motion to vacate his conviction, fourteen years after his trial, and it was based on matters clearly known to the petitioner at the time of trial, at the time of his direct appeal, and at the time of his first motion to vacate. The petitioner makes no attempt to explain why his appellate counsel never mentioned this claim until the second motion to vacate. Accordingly, the petitioner having failed to establish cause, it is unnecessary for the court to determine whether the petitioner suffered prejudice because of ineffective assistance of counsel.

■■■ The court next reviews the various contentions that counsel's inadequate representation at trial amounted to a fundamental miscarriage of justice. First, assuming the petitioner's allegations are true, drug and alcohol use "alone, [do] not establish ineffectiveness." *Caballero v. Keane*, 42 F.3d 738, 740 (2d Cir.1994). The record discloses no incapacity on counsel's part resulting from his alleged drinking, or any concern expressed by the court with regard to counsel's condition. The petitioner neither replaced his counsel nor indicated dissatisfaction with his counsel to the court. Nor has the petitioner cited a single instance where the alleged drinking and illness affected counsel's performance.

■■■ As to the petitioner's contention that his trial attorney would not permit him to testify in his own behalf, it is generally true that only a defendant can waive the right to testify, not defendant's counsel. *See Brown v. Artuz*, 124 F.3d 73, 76–78 (2d Cir.1997). Nothing in the trial record, however, supports the claim that petitioner's trial counsel refused to permit him to testify. Even if counsel had done so, that alone does not constitute ineffective representation. *See id.* at 79. The petitioner identifies no evidence he could have provided through his own testimony that was not otherwise presented to the jury. *See generally id.* at 80–81. Therefore, the court finds no basis to conclude that petitioner has met his burden to establish that counsel's alleged refusal to permit the petitioner to testify probably resulted in the conviction of someone who is likely innocent. *See Schlup v. Delo*, 513 U.S. 298, 326–27, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995); *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

■■■ Similarly, the petitioner's claim that his trial counsel failed to cross-examine Dr. Helpern and to rebut adequately his supposedly false testimony does not demonstrate deprivation of meaningful representation. Generally, an unsuccessful trial tactic or strategy does not constitute ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998); *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.1987) ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are … strategic in nature" and do not ordinarily support an ineffective assistance claim).

Review of the evidence convinces the court that trial counsel simply made a tactical decision not to cross-examine the prosecution's rebuttal expert on the reliability of stomach content. At trial, the petitioner's counsel introduced extensive expert testimony in the defense case on

342

the unreliability of stomach content as an indicator of time of death. Moreover, in response to the prosecution's rebuttal expert, the petitioner's counsel offered, and was permitted to introduce, sur-rebuttal evidence from yet another expert relating to the issue of stomach content. These efforts by petitioner's counsel reflect a close appreciation of the importance of the stomach content issue and tactical choices concerning the best way to prevail on the issue.

In any event, regardless of whether counsel's decision not to challenge the prosecution's rebuttal expert on cross-examination on this issue constituted ineffective assistance, there is no question that the issue was directly addressed with, and that the rebuttal expert's conclusions were contradicted by, other evidence offered by the petitioner's counsel at trial. Thus the petitioner's counsel provided the jury with ample evidence challenging the conclusion of the prosecution's rebuttal expert as well as the basis for that conclusion. In these circumstances, nothing about counsel's tactical decisions in addressing the stomach content issue led to a fundamental miscarriage of justice. The jury's verdict reflects that they simply rejected the defense's evidence and arguments.

#### (4) The Perjured Expert Testimony Claim

As to the perjured expert testimony claim, the petitioner argues his trial counsel's ineffective representation establishes "cause" for his failure to satisfy state procedural requirements. "Ineffective assistance of counsel ... is cause for a procedural default." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir.1997) (quoting Murray, 477 U.S. at 488, 106 S.Ct. 2639). As set forth above, however, the petitioner's claim of ineffective assistance is itself procedurally barred. It therefore may not be used to establish cause for purposes of overcoming another procedural default. See id. at 139–40. Nor can the petitioner show prejudice or a fundamental miscar-

riage of justice for the reasons set forth above in section I.B.1 of this opinion.

In sum then, the court concludes that the petitioner's claims based on juror misconduct and ineffective assistance of counsel, as well as the claim of prosecutorial misconduct to the extent it is based on coercion of a witness, improper use of a grand jury subpoena, failing to present exculpatory evidence to the grand jury, and the presentation of perjured expert testimony, were all procedurally barred by the state courts. Because the petitioner cannot establish cause and prejudice or miscarriage of justice regarding any of the foregoing claims, none of the claims is subject to federal habeas review.

### II. THE MERITS

The remaining claims made by the petitioner are properly preserved for review on the merits. In conducting that review, the court bears in mind that the burden of proving constitutional violations on federal habeas review lies with the petitioner. See Whitaker v. Meachum, 123 F.3d 714, 716 (2d Cir.1997).

#### A. Proof of Petitioner's Guilt Beyond a Reasonable Doubt

Turning to the petitioner's claim that his guilt was not proven beyond a reasonable doubt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus a petitioner is entitled to habeas corpus relief only "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Id. at 324, 99 S.Ct. 2781. Thus, the court must determine whether the record is so totally "devoid of evidentiary support that due process issues are raised." Bossett v. Walker, 41 F.3d 825, 830 (2d Cir.1994) (quoting Mapp

*v. Warden,* 531 F.2d 1167, 1173 n. 8 (2d Cir.1976)). A careful review of the record under these standards reveals that the petitioner's conviction is supported by constitutionally sufficient evidence.

The cause of Sophie's death was determined to be by lethal injections of Demerol. The prosecutor introduced expert medical testimony, based on observations and autopsies, that estimated the time of death to be between 11:00 p.m. on June 17 and 3:00 a.m. on June 18, a time span during which the petitioner concedes he was alone with the decedent. The prosecutor also introduced powerful evidence to establish the petitioner's motive and consciousness of guilt. First, the petitioner inaccurately diagnosed the cause of his wife's death, signed her death certificate, and removed her body from New York to Pennsylvania without notifying the authorities, all within hours of finding his wife dead. Several days later, when the police arrived to search his home, the petitioner asked his daughter to hide Demerol and syringes from the police while they were executing a valid search warrant for the Friedgood home. For years prior to his wife's death, the petitioner had been carrying on an affair with a nurse, who had returned only a few months earlier to her native Denmark with two children fathered by the petitioner. In the days following his wife's death, the petitioner sold thousands of dollars worth of his deceased wife's securities. On June 25, 1975, after calling to tell his children he had had a cardiogram and would be away for a few days resting in a motel, the police found the petitioner aboard a flight to London with a one-way ticket and a satchel containing approximately $725,000˙ worth of cash, stocks, bearer bonds, and jewelry.

Although all of the evidence used to convict the petitioner of his wife's murder was circumstantial, such evidence may be the basis for a conviction. *See United States v. Strauss,* 999 F.2d 692, 696 (2d Cir.1993). Viewing the evidence in the light most favorable to the prosecution, the court has no hesitancy in concluding that a reasonable trier of fact could easily have found the petitioner guilty beyond a reasonable doubt.

## B. *Prosecutorial Misconduct*

The petitioner contends that prosecutorial misconduct deprived him of a fair trial. He raised eight sub-claims of prosecutorial misconduct in his petition. As discussed above, four of the sub-claims are beyond federal review. The remaining four claims of prosecutorial misconduct are that the prosecutor (1) improperly testified at a pretrial suppression hearing, (2) improperly commented on the petitioner's motive during the opening and summation, (3) adduced testimony concerning a missing bottle of Demerol in bad faith, and (4) improperly adduced testimony concerning the petitioner's refusal to speak with the police without counsel present.

▮▮▮▮ The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is " 'the narrow one of due process, and not the broad exercise of supervisory power.' " *Floyd v. Meachum,* 907 F.2d 347, 353 (2d Cir.1990) (citing *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)). To obtain habeas relief for prosecutorial misconduct, the petitioner must establish that the conduct had a substantial and injurious effect or influence in determining the outcome of his trial. *Bentley v. Scully,* 41 F.3d 818, 824 (2d Cir.1994); *Davis v. Kelly,* 2 F.Supp.2d 362, 367 (W.D.N.Y.1998). Where the claim rests on allegations of improper argument, "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden,* 477 U.S. at 181, 106 S.Ct. 2464 (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Three factors determine whether prosecutorial misconduct has reached that level: (1) the severity of the misconduct; (2) the measures taken by the trial court to

**344**

remedy the misconduct; and, (3) the certainty of conviction absent the improper conduct. *Bentley*, 41 F.3d at 824. With these considerations in mind, we examine the various instances of alleged misconduct.

### (1) *Prosecutor's Testimony at Suppression Hearing*

■ On the eve of his trial, the petitioner made a suppression motion that resulted in a hearing at which the prosecutor was called to testify, along with other witnesses, concerning the events surrounding the seizure of the petitioner's satchel by his daughter. The prosecutor served as counsel for the suppression hearing, except when he himself testified, and was thereafter permitted by the court to serve as the prosecutor at trial. The court determined that given the lateness of the motion and the complexity of the case, withdrawal by the prosecutor was neither feasible nor in the interest of justice. *See* Code of Professional Responsibility D.R. 5–101(B)(4).

■ The petitioner now contends that the prosecutor's participation as counsel at the hearing and at the trial constituted misconduct. In the face of the trial court's specific determination approving the prosecutor's role, this court fails to see how the prosecutor's action could be termed misconduct. Disciplinary Rule 5–101(B)(4) specifically permits counsel to serve as both witness and advocate when disqualification would work a substantial hardship on the client because of counsel's distinctive value to the client in connection with the case. The prosecutor was not called to testify at trial by either party, nor should he have been called, as he had no firsthand knowledge of any of the facts at issue. Thus, his dual role was never before the jury and could have had no impact on their determination. In any event, the petitioner has articulated no harm, much less constitutional harm, that he suffered because the prosecutor served as counsel at the hearing and at trial.

### (2) *Improper Statements in Opening and on Summation*

The petitioner contends that the prosecutor made improper statements during his opening statement, which were reiterated in his summation. Specifically, in his opening statement, the prosecutor stated that "[the state will show] that no one else had a motive to kill Sophie Friedgood." Tr. at 178. In his summation the prosecutor stated that "[a] doctor uses a hypodermic needle and demerol [sic]. A bricklayer uses a brick. Who else? Don't be had ... there is only one person," Tr. at 5156–57, and "Could one person have done it? Madam and gentlemen, very definitely. Very surely. Yes ..." Tr. at 5144. The petitioner contends that these statements were improper because they indicated to the jury that the prosecutor had personal knowledge that the defendant was the only person with a motive to kill Sophie. Another statement about which the petitioner complains was the prosecutor's comment in summation, referring to direct evidence, that "[i]n murder cases we don't have it." Tr. at 5157. The petitioner contends that this was an improper, unsworn statement of the prosecutor's own experience in homicide cases.

The first three statements are not properly labeled "prosecutorial misconduct." A literal reading of the statements could not lead a reasonable trier of fact to the conclusion that the prosecutor had personal knowledge that the petitioner was the only person with a motive to kill Sophie. In his opening statement, the prosecutor merely asserted what the state intended to prove during the trial. Furthermore, the prosecutor's comments during summation were in direct response to the defense strategy of raising the possibility that someone other than the petitioner had a motive to kill Sophie. Nothing in the prosecutor's statements indicates an attempt to impart personal knowledge to the jury. Although the trial court took no curative measure in connection with these statements, none was necessary because they were not improper.

As to the statement concerning the absence of direct evidence in murder cases, the statement was not appropriate because it went beyond the record. Nevertheless, the comment was so brief that it can hardly be categorized as serious misconduct. The absence of any contemporaneous objection to the argument confirms that it was not perceived as particularly harmful at the time. In any event, to the extent this and the other statements could be considered improper, they were fleeting compared to the record as a whole, which confirms the petitioner's guilt beyond a reasonable doubt.

### (3) *Testimony Concerning a Missing Bottle of Demerol*

The petitioner contends that it was misconduct for the prosecutor to attempt to introduce testimony that a bottle of Demerol, which had been prescribed by a colleague of the petitioner and obtained from a pharmacy located across the street from the hospital where the petitioner worked, could not be accounted for. Tr. at 3124–29. After defense counsel objected to this testimony, the trial court allowed the prosecutor to continue the line of questioning on the condition that the testimony would be connected to the petitioner. Tr. at 3126. The prosecutor was unable to do so, and the defense moved for a mistrial. Although the trial court agreed that the evidence had not been adduced in good faith, Tr. at 3129, 3151, it denied the motion and gave the jury the following instruction:

> I instruct you equally in strong terms that you are to disregard all the testimony adduced concerning a Dr. Schuman, the Satellite Pharmacy and the bottle of demerol [sic] allegedly missing from the pharmacy.
>
> I hereby strike that entire testimony from the record and you are to give no import to it whatsoever.

Tr. at 3158–59.

The petitioner argues that the "missing Demerol" testimony was damaging to his

trial notwithstanding the preceding instruction and, thus deprived him of due process. According to the petitioner, "the attempt to erase its impact from the jury's mind by a general instruction, which did not tell the jury why the evidence was stricken, was patently insufficient." Pet'r. Mem.Supp. at 45.

Using the three-step analysis from *Bentley*, the court concludes first that the misconduct (if indeed it can be labeled misconduct) was not severe. The testimony was elicited on redirect examination of a witness in response to cross-examination that sought to establish that the petitioner, although a physician, was not certified to prescribe narcotics like Demerol. The prosecutor sought to show that the petitioner could have obtained access to the Demerol through his colleague. Although unable adequately to connect the missing bottle to the petitioner, there was nothing false or intentionally misleading in the evidence the prosecutor sought to introduce. Second, the alleged misconduct was promptly remedied by a pointed and unequivocal curative instruction. Finally, the "missing Demerol" testimony was ultimately unimportant because other, much stronger testimony from numerous other witnesses established that the petitioner, by his own admission, had a supply of Demerol available to him notwithstanding his inability to prescribe it himself. Indeed, the petitioner's daughter testified that when the police arrived to search the petitioner's home several days after his wife's death, the petitioner instructed her to secrete various medical materials, including a bottle bearing the word "Demerol" and a hypodermic syringe. And the prosecution introduced testimony from the petitioner's other children and two sons-in-law that, in response to their questions about why the police were searching for Demerol, the petitioner made various statements concerning his wife's alleged use of Demerol and his efforts to hide the

evidence of that drug to prevent speculation about suicide or his wife's "pill-popping." Given this far more damaging testimony concerning the petitioner's access to, and actual possession of, Demerol, there is no basis to believe the stricken testimony concerning the "missing Demerol" had any impact on the jury's decision to convict.

#### (4) *Petitioner's Refusal to Speak with Police Without Counsel Present*

 Finally, the petitioner alleges that it was misconduct for the prosecution to adduce testimony that the petitioner declined to speak to the police in the absence of his attorney, after being advised of his constitutional right to do so. A review of the transcript reveals that, in response to the prosecutor's question about a conversation that occurred prior to the search of the petitioner's home, a police detective testified that he "advised him of his constitutional rights, and at that time he indicated that he wanted to have his attorney present and we waited for a short time and then started to search and [petitioner's lawyer] responded to the house." Tr. 3133–34. The court then sustained objections to two questions about further conversations with the petitioner before his attorney arrived, and a short time later gave a curative instruction to the jury. There is no evidence that the petitioner sought a mistrial on the basis of this line of questioning.

Although evidence that the defendant exercised his constitutional rights to silence and counsel is inadmissible, *Miranda v. Arizona*, 384 U.S. 436, 468 n. 37, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the petitioner fails to show that he was substantially prejudiced by the testimony proffered by the prosecution. *Brecht v. Abrahamson*, 507 U.S. 619, 631, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The three factors regarding substantial prejudice are not satisfied. First, the misconduct, although intentional, amounted to testimony about a single instance of the petitioner's exercise of his right to counsel. The testi-mony was not prolonged, and the prosecutor did not seek to draw attention to the testimony in summation or at any other point in the trial. Second, the trial judge promptly administered a strong curative jury instruction:

> Members of the jury, reference has been made this morning concerning the fact that at the time of the execution of the search warrant, that the defendant was advised of his constitutional rights and that he asked if he could have his attorney present.

> I admonish you in the *strongest terms that I can command,* that under no circumstances may you draw inferences whatsoever from the exercise of any of his constitutional rights and that he asked if he could have his attorney present.

Tr. at 3158 (emphasis added). Finally, in light of the strength of the prosecution's case, it is plain that this snippet of evidence, in a trial that lasted nine weeks, could have played no role in the petitioner's conviction, and that the jury would have convicted the petitioner without it.

Having reviewed the above four instances of alleged prosecutorial misconduct, the court finds that two do not constitute misconduct, and that none of the four could have had a "substantial and injurious effect or influence in determining the jury's verdict" when viewed in the context of the weighty evidence of defendant's guilt adduced at trial. *Brecht,* 507 U.S. at 631, 113 S.Ct. 1710 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Prosecutorial misconduct even "if improper or 'universally condemned,' usually [is] not enough to warrant a granting petition." *Gatto v. Hoke,* 809 F.Supp. 1030, 1040 (E.D.N.Y.1992) (quoting *Donnelly,* 416 U.S. at 643, 94 S.Ct. 1868). The prosecutor's conduct here furnishes no basis for finding a constitutional violation warranting habeas relief.

### C. The Court's Refusal to Admit Defense Evidence to Refute Prosecutor's Statements Regarding Petitioner's Motive

The petitioner argues that the court's failure to allow evidence of his son-in-law's motives to kill the victim, in conjunction with the prosecution's remarks in the opening and closing statements regarding the petitioner's motive, see section II.B.2 above, further deprived him of his "right to due process of law, and destroyed any reasonable hope of a fair trial." Pet'r. Mem.Supp. at 36. At trial, the defense attempted to show, through cross-examination of the victim's son-in-law Jack Cook and other witnesses, that Cook had a financial interest in Sophie's death. Tr. at 4871. When Cook denied knowledge of certain matters relating to the victim's will and denied making statements indicating he favored the victim's demise, the petitioner sought to offer extrinsic evidence to undercut Cook's credibility on these points and to provide further proof of his financial motive. The trial court ruled that the evidence was inadmissible because the petitioner could not connect the son-in-law to the actual commission of the crime. Tr. at 4873–80.

■■■ In general, rulings by the state trial court on evidentiary questions are matters of state law and pose no constitutional issue. *See, e.g., Estelle v. McGuire,* 502 U.S. 62, 67–69, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *Spencer v. Texas,* 385 U.S. 554, 562–63, 87 S.Ct. 648, 17 L.Ed.2d 606, *reh. denied,* 386 U.S. 969, 87 S.Ct. 1015, 1016, 18 L.Ed.2d 125 (1967). Even erroneous state evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983). "Rather, erroneous exclusion of evidence warrants habeas relief only if the omission deprived the petitioner of a fundamentally fair trial." *McLean v. McGinnis,* 29 F.Supp.2d 83, 92–93 (E.D.N.Y.1998) (citing *Estelle,* 502 U.S. at 71–72, 112 S.Ct. 475).

To decide whether an erroneous evidentiary ruling has denied a criminal defendant a fair trial, the court must determine whether the excluded evidence would have created "a reasonable doubt that did not otherwise exist." *Id. (quoting United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

■■■ The trial court's exclusion of extrinsic evidence concerning the possible financial motivation of the petitioner's son-in-law does not appear to be erroneous. Well-established law in New York prohibits the introduction of evidence concerning the motive of a person, other than the defendant, to commit the crime at issue unless there is some additional evidence to connect the other person to the crime. *See, e.g., Greenfield v. People,* 85 N.Y. 75, 90 (1881); *People v. Bugman,* 254 A.D.2d 796, 679 N.Y.S.2d 491, 492 (4th Dep't 1998); *People v. Wade,* 245 A.D.2d 473, 474, 666 N.Y.S.2d 467, 468 (2d Dep't 1997); *People v. Felder,* 231 A.D.2d 589, 589–90, 647 N.Y.S.2d 526, 527 (2d Dep't 1996); *People v. Rodriguez,* 220 A.D.2d 699, 700, 632 N.Y.S.2d 649, 650 (2d Dep't 1995); *People v. Austin,* 112 A.D.2d 242, 242, 491 N.Y.S.2d 458, 459 (2d Dep't 1985); *People v. Aulet,* 111 A.D.2d 822, 825, 490 N.Y.S.2d 567, 570 (2d Dep't 1985). The petitioner has made no offer of proof to support an inference that Cook had an opportunity to commit the murder for which the petitioner was convicted. Nor is extrinsic evidence admissible for impeachment purposes when it relates to collateral matters. *See, e.g.,* Fed.R.Evid. 608(b). Thus, the court finds no basis to conclude that the trial court's exclusion of extrinsic evidence of Cook's motivation was error.

Even if the exclusion of the proffered evidence was found to be erroneous, it would not support habeas relief because the excluded evidence would not have "created a reasonable doubt that did not otherwise exist." *Agurs,* 427 U.S. at 112, 96 S.Ct. 2392. The core of the petitioner's defense centered on the victim's time of death. The prosecution contended the

death occurred during the middle of the night when only the petitioner was present. The petitioner conceded he was the only person present with the victim during this time, but contended instead that the victim actually died hours later, well after 9:00 a.m., when the prosecution conceded that the petitioner had left for work. Extensive medical evidence was introduced on time of death. The petitioner also produced testimony by witnesses tending to establish that the victim had been alive after 9:00 a.m., when the petitioner's maid was the only person known to have been at the victim's residence. Ultimately, the jury had to conclude, beyond a reasonable doubt, that the victim was murdered before the petitioner left and before anyone other than the petitioner was with her. Cook's possible motives to kill the victim had nothing to do with this issue.

Moreover, even though time of death was the battleground, the petitioner was permitted on cross-examination of various witnesses to establish that Cook, a physician, stood to gain financially by the victim's death. Thus, he was permitted to argue to the jury that Cook had a motive to murder the victim, and in that way to raise reasonable doubt. The problem for the petitioner was that he had no proof that Cook had any opportunity to commit the murder. In the circumstances, then, further proof regarding Cook's motive could have had no impact in creating reasonable doubt because, regardless of the strength and extent of Cook's possible motives, the petitioner would not have been able to overcome the crucial fact that there was no evidence linking Cook to the murder.

### D. *Trial Court's Refusal to Charge Jury on Time of Death*

 Next, the petitioner contends that the trial court erred when it refused to charge the jury regarding the time of Sophie's death. Generally, a jury charge is a matter of state law, and is not reviewable by a federal court. *See, e.g., Wright v.*

*Smith*, 569 F.2d 1188, 1191 (2d Cir.1978); *Player v. Berry*, 785 F.Supp. 339, 343 (E.D.N.Y.1992). A federal court can review such a claim, however, when it is shown that the erroneous jury charge "deprive[d] defendant of a federal constitutional right." *Player*, 785 F.Supp. at 343. To obtain relief, the petitioner must show that the erroneous state jury charge "so infected the entire trial that the resulting conviction violates Due Process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). The petitioner has failed to offer facts sufficient to sustain this claim.

 "Due Process ... protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Here, the facts to be proven beyond a reasonable doubt were that Charles Friedgood "[w]ith intent to cause the death of" Sophie Friedgood, "did cause the death" of Sophie Friedgood. N.Y.Penal Law § 125.25(1) (McKinney 1998). The court charged the jury that if they "find the People have proven beyond a reasonable doubt that the defendant, Charles Friedgood, on or about the [17th] or 18th day of June 1975 ... with the intent to cause the death of Sophie Friedgood, did cause the death of Sophie Friedgood by injecting her with a lethal dose of Demerol, then you *may* find the defendant guilty of murder in the second degree." Tr. at 5194 (emphasis added). While the charge could have properly included statements concerning the time of death, it cannot be said that such an omission "infected the entire trial" to the extent that it deprived the petitioner of his right to due process of law. *See Blazic v. Henderson*, 900 F.2d 534, 541 (2d Cir.1990) (quoting *Cupp*, 414 U.S. at 147, 94 S.Ct. 396). Omissions or incomplete instructions are "less likely to be prejudicial than a misstatement of law." *Henderson v. Kibbe*, 431 U.S. 145, 155, 97 S.Ct. 1730, 52

L.Ed.2d 203 (1977). Moreover, there is no indication that the jury's verdict would have been different had the court included time of death in its charge. *See Blazic,* 900 F.2d at 542 (concluding that the trial court's failure to instruct the jury on defendant's justification defense would not have affected the jury's verdict). The petitioner even noted in his Memorandum of Law that a great deal of trial time was devoted to the time of death issue. At least eight medical witnesses and a dozen or so lay witnesses testified on the issue. The jury was well aware that time of death was a significant factual issue to be decided upon when evaluating the petitioner's guilt or innocence. Accordingly, the court finds that no error of constitutional magnitude occurred, *see Henderson,* 431 U.S. at 145, 97 S.Ct. 1730, and therefore, the petitioner's claim of a faulty jury charge is without merit.

## CONCLUSION

For the foregoing reasons, the undersigned REPORTS and RECOMMENDS that the Charles Friedgood's petition for a writ of habeas corpus be DENIED.

\* \* \* \* \* \*

Any objections to the Report and Recommendation above must be filed with the clerk of the Court with a copy of the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam). March 16, 1999.